Are we ready to go? We are. How about you? My name is Robert Altagan. I'm here on behalf of Mr. Dusko Cavic, who is president of the court, regarding the appeal of an approval of a settlement regarding litigation which was pending in the bankruptcy court, which was pending in a bankruptcy proceeding in which Mr. Cavic was the debtor. I think the court needs to know a little history of what happened here was that Mr. Cavic filed Chapter 7 bankruptcy, and at the time that he filed, he had certain lawsuits pending regarding certain defendants on a transaction that took place in Las Vegas where he lost substantial sums of money. In 2006, the trustee entered into an agreement, a written agreement, with Mr. Cavic that if Mr. Cavic would finance and pay for the litigation, the trustee would pursue the litigation. Mr. Cavic paid $10,000 to the trustee and then provided payment to the counsel that was selected, Mr. Megan. He paid his fees. The trustee then, at the time of the agreement, the trustee presented the bankruptcy judge at the time that was handling the case an application to employ Mr. Megan and disclosed that Mr. Cavic was bearing all the responsibility of the litigation and was bearing all the risk of the litigation. And Mr. Cavic proceeded to make payments to Mr. Megan. At some point subsequent to that, I'm sorry, who was making the payments to Mr. Megan? Mr. Cavic. At that point, was the trustee in charge of the litigation? Oh, that's a good question. If you read the agreement, the Nevada agreement, which is in the record, it says that Mr. Cavic bears the risk of the litigation. However, the trustee is responsible for the litigation and that the benefits of the litigation would go to the estate if the prevail litigation and Mr. Cavic would be reimbursed all his fees out of pocket that he incurred and that he paid to Mr. Megan from any funds received from the estate. Now, this is an important point because when the trustee brought the motion to approve the settlement, the court at that time was not apprised of the Nevada agreement. It was only later, subsequent to the BAP ruling, that the court found that Mr. Cavic was entitled to a reimbursement of his fees and that Mr. Megan was handling the entire lawsuit, both cases. And that's important because at the time that the trustee filed the motion to approve the settlement,  the court believed that the settlement related to something other than what Mr. Cavic had been paying for, which raises the next point. It doesn't change anything. Well, I can explain why it changes. Because when the trustee brought the proposed settlement to the judge, there was no economic benefit to the estate because it hadn't been adequately explained to the judge. The amount of money that was recovered would go to Mr. Cavic, substantially. So what was the reasoning that the trustee would want to settle this case? Well, the trustee brought the motion. What answer did the trustee give to that question? Basically, the trustee said they were tired of the litigation, they wanted to close the case,  and Mr. Cavic showed up in court as a pro per without counsel and basically said, I want to continue this case. It's worth a lot more money than what they're settling it for, a lot more money. And what was the court's response? The court's response was, one, the Nevada agreement that I've alluded to earlier  and it was only later that the court found that it did apply, that Mr. Cavic had financed all of the litigation. And the point really is this was... The point really is the court, and I think it was the trustee who invited it, but in any event, the court set up a procedure, the overbid procedure, whereby if Mr. Cavic, who is, after all, here as the debtor in a Chapter 7 filing, so not somebody who's necessarily on the top of the list of people that speak to the bankruptcy court with credibility, if he wants to step forward and take this lawsuit over, he's got a mechanism that's been provided for him to do so. What's wrong with providing a mechanism like that? I agree that the mechanism provided to Mr. Cavic would be appropriate in a bankruptcy proceeding so somebody third party, including Mr. Cavic, could overbid and buy the claim. The notion is if there's value to this claim, somebody will come forward and take the claim. Well, let me respond to that. At the time that the court considered the overbid procedure, Mr. Cavic contended that because he had financed the litigation and put up all the money for the litigation and paid Mr. Megan, that he should be entitled to credit bid. That's what he contended, but why is that true? Because I believe Section 363 allows for a credit bid in certain circumstances of the bankruptcy code. Of a contingent amount? A contingent, unspecified, uncertain as the total amount? He offered $50,000, he offered to pay the $52,000 that they were getting, plus put up his house as additional collateral, and plus saying I'm going to be entitled to the $52,000 after an appropriate motion would be filed to basically get my fees back because that's what the agreement said. The trustee said, and the court approved, if we get any money from this case, you have an administrative claim for all your fees. Now, the question I have is why did they bring the settlement to the judge and say this is a good settlement? The judge did not, I don't believe, through the adequate steps to analyze what was this case truly worth, what evidence was supplied to the bankruptcy court to say this is a good settlement for the creditors and the potential of a surplus case. If the case settled for more money or litigation derived more money, then the unsecured creditors would get paid and Mr. Cabot could receive a surplus. He thought the case was worth millions of dollars. I don't know if it's worth millions of dollars or $5. Did Mr. Meehan actually file suit? Yes, the suit was filed. And what's the status of that suit? The suit was the settlement, they dismissed the case apparently, or they're in the process of dismissing the case. Can the suit be filed again? I believe so. I think that they can unwind the settlement, refund any monies that were paid. The statute of limitations is not run? That I don't know. I don't know whether the statute of limitations is run or not. I know the bankruptcy code provides a mechanism where the statute of limitations is told while the case is in bankruptcy. I'm not sure whether that particular statute has run out or not. They contend that it is. They haven't provided any evidence of that fact. If the statute of limitations has run, doesn't that make your claim moot? It may. We don't know that it has. Wouldn't that be important to know, though? Yes, I don't believe that it has run. But you just told me that you didn't know it generally has run. I can't say that if somebody briefed the motion and filed a motion and had it heard that the statute, I believe that it has run. You think it's a complicated matter and there's at least a reasonable argument? Absolutely. And I think that the bankruptcy code, I can't think of the section off the hand, it might be 109 or 110 that says that all statute of limitations are told and there's a two-year addition to the statute, but there was a lawsuit filed, so the statute of limitations would only apply to the original action, and if the case had been dismissed as part of a settlement that would be unwound, I don't believe it would have run. So, again, we get back to why did they offer this settlement other than to close the case and benefit themselves in administrative claimants? There would be no other reason because there's no economic benefit to the estate. Who's themselves? The trustee. The Chapter 7 trustee and his counsel obviously have a purse priority on any funds in the estate. They would file their application for a fees and any money in the estate would go, I believe would be an insolvent estate in the sense that there wouldn't be any money for any Chapter 7 creditors, so the reason to put money in the estate, obviously, is to pay the trustee's fees and file your application for compensation as counsel for the trustee. And, again, I get back to they haven't explained why. Wouldn't it have been in the trustee's interest to get more money? Wouldn't their fee depend on how large an estate they have? I agree. If there's more money in the estate, absolutely. A motive, in fact. Absolutely. To prosecute it to the extent that it was feasible. Well, that's the argument of whether or not, the argument I'm trying to make, is whether there was an adequately analyzed settlement that the court approved, that there was any evidence supporting their position that this was a good deal or a reasonable deal, other than a conclusion that they wanted to do it. That's the point that I don't think the bankruptcy court ruled on initially, and then when they subsequently ruled, after the BAP ruled, that, yes, Mr. Kavik was entitled to this money, and that Mr. Kavik did finance litigation, and the litigation that was being settled encompassed the entire matter. That's the point. The point being is they never showed an economic benefit to the estate by accepting this settlement, and I don't think the court, at the time that it approved the settlement, was fully aware. It was only later that the court, after analyzing and taking testimony from Mr. Megan, that the court reeled that the Nevada agreement that went all the way back to 2006 supported Mr. Kavik essentially getting a lion's share of the money. And that, to me, so when they brought the settlement to the court, that was not fully, the court was not fully apprised of that. It was only later that the court became aware. When fully apprised, they still approved. Well, that's not correct. No? No. The settlement was approved in June of 2008. There was a motion for reconsideration in August of 2008, and it wasn't until March of 2009 that he made the ruling that Kavik was right. The Nevada agreement applied to all the litigations, not to the part that was being settled. And I would point out in the record, on appellees in the number one of the juvenile court. And notwithstanding that, he denied the motion for reconsideration. Yes, he did. But he, again, it wasn't until subsequent to the motion for reconsideration that the court considered, and after taking testimony from Meegan, that, yes, Meegan was hired to handle all the litigation. In the transcript of June 4th, at page 10 and 11, the court said the Nevada agreement did not apply to what he was ruling on. It was only later that he determined that the Nevada agreement did apply. And that occurred after the BAP decision. So I would like to reserve the balance of my time. You may. Thank you, Your Honor. Your Honors. Now we'll hear from appellees. Good morning, Your Honors. May it please the Court, my name is Linda Bui. I'm with Shulman, Hodges & Bastion. I'm here on behalf of the Chapter 7 trustee, the appellee, Mr. Nathan Reinmiller, who is also here on behalf of some of the settling defendants. Could you try and speak a little louder? Yes, sorry about that. Or move the microphone a little closer. Sorry, Your Honor. And I'd like to reserve three minutes for Mr. Reinmiller. Your Honor, an order approving a compromise can only be reversed where there is clear abuse of discretion. This Court has said that. There is no abuse of discretion by the Bankruptcy Court here, let alone clear abuse of discretion. And, in fact, it would be impossible for the Bankruptcy Court to have abused its discretion, based upon Mr. Kavik's argument that the Bankruptcy Court failed to consider something that was not before the Bankruptcy Court when it considered the motion for approval of compromise. Under ACM properties, there is no abuse of discretion if there are adequate facts to support a decision that the Court made. In this case, the motion for approval of compromise has two aspects. One is the actual set of settlements. The second aspect is the overbid or the option. With respect to the settlements, Mr. Kavik never opposed the merits of the settlement. His opposition is void of any analysis or any factual dispute concerning the four factors in which the Bankruptcy Court analyzed the settlements under A and C properties. In fact, the Bankruptcy Court pointed this out in its Excerpt Record Exhibit 1, page 10 to 11, and Mr. Kavik's Excerpt Record Exhibit I at page 12. The Bankruptcy Court discussed paragraph by paragraph the opposition filed by Mr. Kavik and concluded that Mr. Kavik did not challenge the merits of these settlements, to which Mr. Kavik agreed. In fact, the Bankruptcy Court had before the Bankruptcy Court the voluminous pleadings, which include the motion for approval, the onus motion for approval of compromise over 100 pages, the late-filed opposition by Mr. Kavik, the replies filed by the trustee, and one of the vesting parties, one of the set of settling defendants. In addition, the Court had various facts before the Court, including that there was an adversary proceeding that had been transferred to Nevada, that the trustee was having difficulty obtaining local counsel, and that's at the Excerpt Record Exhibit 1, page 4, line 21 to 15. That the case at that point was administratively insolvent. That there was a pending motion for summary adjudication in Nevada that the trustee would have had to defend, and the reason why the trustee wasn't defending that and that the matter was continued was because of the settlement. And the Court inquired about Mr. Kavik's ability to pursue the lawsuit and the estate's exposure. So not only did the Court have pleadings and spend over almost an hour at the hearing asking a lot of questions and making determinations, the Court then concluded that Mr. Kavik did not object to the merits. But Mr. Kavik did say that he wanted to participate in the overbid because he was there to overbid, and that goes to the second part of the motion. The Court, in fact, gave Mr. Kavik additional time to qualify himself to bid. However, Mr. Kavik failed to qualify himself. And, of course, the Court then confirmed the settlements to sort of the highest bidders, the settling parties. So under ANC properties, the Bankruptcy Court could not have abused his discretion because there is an abundance of facts on the record to support the Court's decision. But more importantly, based upon the arguments set forth in the brief, it is impossible for the Bankruptcy Court to have abused its discretion because the basis in which Mr. Kavik is asserting that the Bankruptcy Court abused its discretion is the subsequent order from the same Court after an evidentiary hearing that allowed Mr. Kavik an administrative claim. So here are the fatal flaws. First, it was a subsequent ruling. The Court didn't have that fact before the Court when the Court ruled on the motion for approval compromise. Second, it is irrelevant to the merits of the motion under ANC properties. Nothing about the allowance of the administrative claim goes to the merits of the motion. How is it irrelevant? If it affects what benefit is received by the estates as a result of the settlement, how is it irrelevant?  It may be relevant to the overbid procedure. But how is it irrelevant to the merits? The merits presumably, if there's no benefit to the estate from a settlement, how does that not speak to the merits? The allowance of the administrative claim does not speak to additional benefit. There has to be multiple steps that have to occur. And this is the reason why it affects the overbid, the actual auction itself. If this is an answer to my question, I don't understand it. Okay. Let me put the question again. In approving the settlement, presumably the Bankruptcy Court pays some attention to whether the settlement benefits the estate. If it turns out the settlement does have no financial benefit to the estate in terms of bringing money to the estate, how is that not a relevant factor? That is a relevant factor, additional benefit net to the estate. However... If the net to the estate is zero, isn't that something to be taken into consideration? Yes, Your Honor. But the net to the estate in this case would not be zero unless a certain contingency occur based upon the allow administrative claim. When Mr. Kavik is saying that the allow administrative claim would have allowed him to use the dollar amount on the allow claim to credit bid and, therefore, be the successful bidder. I understand there is an argument with regard to his ability to credit bid this as-of-yet unascertained administrative claim. I'm still on the first step, approval of the settlement. If you know what's out there is going to include a claim for the expenses in prosecuting pursuant to, I guess it's the Nevada Agreement, and it's not implausible to believe that the amount of that claim will amount to something, maybe something as great as what's being taken as a result of the settlement. So you're looking at at least the possibility of a zero benefit settlement, a zero benefit to the estate at the time of settlement. Why isn't that a factor to be considered? Because there was no allowed administrative claim at the time. But there is an agreement which the Court subsequently determined, in fact, covered a substantial amount of expenses, and the Court by that decision did not find that the allow claim is based upon the Nevada Agreement. The Nevada Agreement has never been approved by the Bankruptcy Court. It was the employment application of Mr. Neigat, and it was, in fact, the basis for which Mr. Kavik was allowed a claim. So the Nevada Agreement is not the Nevada Agreement. Fine. It's the employment agreement. The Court approved the employment agreement, so they know that there's a potential claim for attorneys' fees coming from a successful prosecution. If something's settled, well, that's, at least to some extent, a successful prosecution. The receipts from that settlement are potentially claimable under this counsel agreement. Why isn't that something for the  Well, it didn't have what? It didn't have the order allowing the claim. It's, yes, I understand what the Court is saying. Well, it didn't have the order allowing the claim because the calculation wasn't until sometime down the road. But if it had approved the counsel agreement, then the possibility of the claim was evident to the Court. Yes, Your Honor. There is that possibility. However, there has to be a leap. It is unheard of to allow a claimant for an administrative claim to be able to use that claim to credit bid. Now, you keep trying to move to the credit bid issue. I'm still stuck on number one. If you're facing a serious prospect of a zero benefit to the estate, how is it you approve the settlement? Your Honor, the Court wasn't faced with that possibility, first of all, because the claim, in order for the possibility of having net zero for the estate, the Court would have needed to, at the time of the compromise motion, allow Mr. Kavik's claim, allow him to credit bid, use that dollar amount, which cannot be determined until at the end of the bankruptcy case, usually. There's nothing in the bankruptcy code that would have allowed Mr. Kavik to, who has an asset. You want to talk about what you want to talk about, I take it. No, no. I'm sorry, Your Honor. I'm sorry. I thought I addressed it. Yes, there is that possibility, okay, that the estate would net zero. So if there's a serious possibility of that, how is that not relevant in approving the settlement? I mean, this all started when I thought I heard from you an argument that struck me as implausible, that is, that there was nothing to consider. It seems to me there is something to consider here. If you're facing the possibility that everything that's taken in as a result of the settlement has to be paid to somebody else, such that there's zero net benefit to the estate, why isn't that an important factor to consider in whether or not to approve the settlement? I think at some point the Court did consider the Nevada agreement, okay, and determined that it was irrelevant. The Court did, and I think it's pointed out in the BAP opinion, considered the Nevada agreement not once, not twice, but three times at three different hearings, okay? But the point is, again, I'm sorry if I'm diverting, but it is of no consequence because so many contingencies have to be satisfied before the reality that Mr. Kavik can use all of the allowed claim to credit it. And given how administratively insolvent this case is currently, the value of that claim, which is approximately $40,000 in base value of allowed claim, is probably a fraction of that. And how could the bankruptcy court possibly have abuses discretion when there would be no way for the bankruptcy court to know what all that has happened, that this appeal would be taken to the Ninth Circuit, that by the time the case is over, the value of that claim would be next to zero? It would be impossible for the bankruptcy court to know that. And for that reason, it is impossible for the bankruptcy court to have abused discretion based on something that wasn't before the bankruptcy court at the time that it evaluated and considered whether the settlements were fair and equitable under agency properties. And for that reason, Your Honor, I see that I'm running out of time. The trustee requests that the court affirm the bankruptcy court's rulings. And we'll hear from Mr. Reinmiller. Good morning, Your Honor. One of the – this is Nathan Reinmiller on behalf of the Callister defendant and the Mona and Emerald defendant. Who settled in this case. What I heard the court asking was, how can you settle this case if there's potentially a net benefit of zero to the estate? The court did consider that. And one of the arguments that was put forward was, in this Nevada litigation, there's a chance that we get nothing. Balancing that against $54,000 was the trustee's business judgment. And in fact, the court looked at that and made the comment, you know, you're right. I remember you guys filing that same motion in front of me, and I was inclined to grant it. And that's at the very first hearing. So in considering, it's not just, well, if there's zero here, how can we consider the settlement? It is one in the hand, which is $54,000, versus a potential further debt of the estate because these claims on their face in the complaint that was filed in the Nevada court were past the statute of limitations. They lacked standing. And these motions were pending, ready to be heard. There was no question that there was at least a significant risk at the summary judgment stage that these claims had no value. Not to discuss further down the line, if they managed to find Nevada counsel, potentially specialist counsel because there's a malpractice claim, along with this kind of far-fetched idea of a conspiracy that involved all of these parties, including my other client, Mr. Mona, who his entire involvement was buying the foreclosed property after the fact. Had no legal relationship with Mr. Kavik. So the court was very well apprised of these factors in determining, does this case have a value? Appellant counsel was asked, well, what was the value of these claims? I don't know. And that's exactly the point. The court was given nothing to say, here's why these claims have a value far in excess of what we're getting. And I know that we're focused on the first part of it, but the second part is just as important. There's nothing saying that the overbid procedure in this case was unfair. And Mr. Kavik is arguing, basically it's like he was in a race, arguing, I should have won this race, yet he never entered the race. He was given a very easy way to qualify. And if we were arguing now about whether or not his bid was over what was previously offered, we'd be in a different setting. But he didn't bother to take advantage of that ability. So to now come in and argue and say that the amount paid was insufficient, I don't think they're standing to do that, because he wasn't a debtor at the time. And I see I've run out of time as well. Thank you for the argument. And we'll hear from an appellant for rebuttal. Thank you, Your Honor. First of all, I agree with the court. They never answered the first question, the evaluation of the settlement. They keep talking about the overbid procedure. It must be remembered that in June of 2008, the court approved the settlement without being apprised of the effect of the Nevada Agreement. It's interesting that in their moving papers, they don't even mention Nevada Agreement. Well, whose responsibility is to apprise them of it? Mr. Kavik apprised them after the court already approved the settlement. And that's kind of a problem, because the court's allowed to go on what's in front of the court at the time. But the court was told, or the court believed, that the Nevada Agreement did not apply to the settlement they were offering. He said it was irrelevant. It was later that the court, after hearing the testimony, realized that it was related. Later, after somebody perhaps did a better job of putting in front of the court what was involved. In the meantime, the court at the outset says, okay, I don't hear enough to justify declining this settlement. I don't want to have the state hanging out there forever. But if you believe that there's sufficient value to justify going forward with this case, we'll set up this overbid procedure whereby you can bring in somebody who will invest and realize the great value you think there is. And that's what the court decided to do and did. And your client did not come in with that investor to put up the money to acquire the claim. So what's the problem? There was no economic benefit whatsoever to this settlement. And had the court done the analysis as required by A&C Properties, the settlement should not have been approved until there was some showing that it was worthwhile. We can hear everything about it. You have to go to the other side of the ledger, too. There was far from any certainty in believing that going forward was going to do any better for the estate either. And to the extent that your client believed there was value in the claim and insisted to the court there was value in the claim, the court says, okay, here's a way for you to realize that value. And we know what happened. But I still don't believe that they've made an adequate showing to justify what they did. And I believe that the settlement had no economic benefit to the estate when it was approved. Don't you have something to show that they could have put in what the value was to the estate? Well, Mr. Kavik testified. Mr. Kavik, in court on June 4th, said the case was worth millions of dollars to him. I know. He had lost millions of dollars. He was not represented at the time. But he believed that it had an economic value over and above what they were settling this for and couldn't understand why they would settle for a figure which basically did not benefit the estate. Thank you, Your Honor. We thank you. We thank all counsel for the argument. The case just argued is submitted. That concludes the argument calendar for this morning. We're adjourned. Thank you.
judges: Korman, Clifton, Bybee